UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| GLORIA S. TUCKER, § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. H-05-3073 |
| § | |
| JO ANNE B. BARNHART, Commissioner § | |
| of Social Security, § | |
| § | |
| Defendant. § | |

## MEMORANDUM AND ORDER

Pending before the Court in this appeal from the denial of Social Security disability benefits are the parties' cross-motions for summary judgment. After considering the parties' filings and the applicable law, the Court finds that Plaintiff's motion, Docket No. 15, should be and hereby is **GRANTED IN PART** and **DENIED IN PART** and that Defendant's motion, Docket No. 16, should be and hereby is **DENIED**.

I.   BACKGROUND

Plaintiff Gloria Tucker is fifty-nine years old. Before the onset of her alleged disability, Tucker worked full-time as a secretary at her husband's company. In 1994, she began to experience pain in her fingers, feet, knees, elbows, neck, hands, and joints. Her symptoms sometimes made it difficult for her to walk, and she began to experience chronic fatigue. These problems increased in severity during the next few years and proved resistant to analgesics. Tucker's health problems forced her to reduce her work hours and, in October 2000, to resign from her job.

Tucker's primary physician, Dr. Majmuddin Karimjee, diagnosed her with generalized arthralgia and myalgia, fatigue, depression, and chronic pain consistent with

1

seronegative rheumatoid arthritis. In addition to prescribing pain medication, Dr. Karimjee referred Tucker to Dr. Lee S. Pollack, a neurologist, for treatment of her neck pain and to Dr. Michelle Bricker for nerve blocks to relieve her foot pain. Neither of those treatments was successful. Dr. Karimjee then referred Tucker to neurosurgeon Peter M. Shedden, who ordered a CT scan that revealed protrusions, disc herniation, and stenosis of Tucker's cervical spine. In October 2002, Dr. Shedden performed an anterior cervical discectomy and fusion, with plating, of three of Tucker's cervical vertebrae.

In April 2002, Tucker applied for Social Security disability benefits. Her claim was denied initially and on reconsideration, and she requested, and was granted, a hearing before administrative law judge ("ALJ") Richard L. Abrams. At that hearing, Medical Expert ("ME") George Weilepp opined that Tucker's residual functional capacity ("RFC") allowed her to perform at a highly restricted level of light work activity and that Tucker could sit for no more than 90 to 120 minutes at a time and stand for no more than 60 to 90 minutes at a time. (ALJ Decision at 4 (Admin. Rec. at 19).) He further testified that Tucker could lift or carry 20 pounds occasionally and 10 pounds infrequently and should avoid frequent stooping, twisting, crouching, kneeling, climbing of stairs or ladders, or reaching overhead or pushing or pulling with the left (non-dominant) arm. (*Id.* at 5 (Admin. Rec. at 20).) According to the ME, Tucker must avoid heights, vibration, and dangerous machinery at all times and cannot perform any industrial driving. (*Id.* at 4-5 (Admin. Rec. at 19-20).)

Vocational expert ("VE") Charles R. Poor then testified that a person with Tucker's RFC could perform jobs such as cashier, customer service representative, information clerk, and receptionist. (Transcript of Administrative Hearing (hereinafter

2

"Tr.") at 63 (Admin. Rec. at 91).)  Relying on that testimony, Abrams found Tucker not disabled and therefore ineligible for benefits.  (ALJ Decision at 9 (Admin. Rec. at 24).)  Tucker now asks this Court to overturn that judgment.

## II.   ANALYSIS

### A.   Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  *See* FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 4777 U.S. 317, 322 (1986) (internal quotation marks omitted).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could enter a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  This Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Id.* at 255.

### B.   Standard of Review

Judicial review of an ALJ's denial of disability benefits is limited to determining "whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence."  *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

"It must do more than create a suspicion of the existence of the fact to be established, but no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Id.* (internal quotation marks omitted) (citing *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973); *Payne v. Weinberger*, 480 F.2d 1006 (5th Cir. 1973)).

### C. Legal Standard

A disability claimant bears the initial burden of proving that she is disabled. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). The Court evaluates a disability claim via a five-step process, as follows:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment"; (3) a claimant whose impairment meets or is equivalent to an impairment listed in Appendix 1 of the regulations will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled"; and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether he can do other work.

*Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (citing *Villa*, 895 F.2d at 1022). "A finding that a claimant is not disabled at any point in the five-step process is conclusive and terminates the . . . analysis." *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

If a claimant can satisfy the first four prongs of the test, the burden then shifts to the Commissioner to establish that the claimant is capable of performing "substantial gainful activity" and therefore is not disabled. *Id.* To do so, the Commissioner must

4

produce "'expert vocational testimony or other similar evidence' that jobs exist[,] in the national economy[,] that the applicant can perform." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986) (quoting *Ghorman v. Heckler*, No. 85-3444, slip op. at 9-10 (5th Cir. 1986), 782 F.2d 1038 (table)).

At step five of the analysis, the ALJ must take into consideration the transferability of skills that the claimant has acquired through previous employment. The Social Security Administration ("SSA") defines and assesses transferability as follows:

> (1) What we mean by transferable skills. We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.
> (2) How we determine skills that can be transferred to other jobs. Transferability is most probable and meaningful among jobs in which—
> (i) The same or a lesser degree of skill is required;
> (ii) The same or similar tools and machines are used; and
> (iii) The same or similar raw materials, products, processes, or services are involved.
> (3) Degrees of transferability. There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs. A complete similarity of all three factors is not necessary for transferability. However, when skills are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings, we consider that they are not transferable.

20 C.F.R. § 404.1568(d) (2000).

The SSA has stated that, in determining transferability, several considerations are particularly important:

> Reduced residual functional capacity (RFC) and advancing age are important factors associated with transferability because reduced RFC limits the number of jobs within an individual's physical or mental capacity to perform, and advancing age decreases the possibility of making a successful vocational adjustment. . . . All functional limitations included in the RFC (exertional and nonexertional) must be considered in

5

> determining transferability. . . . These factors[,] as well as the general capacity to perform a broad category of work (*e.g.*, sedentary, light[,] or medium)[,] must be considered in assessing whether or not a claimant has transferable work skills. If an impairment(s) does not permit acquired skills to be used, the issue of transferability of skills can be easily resolved.

S.S.R. 82-41 (Cum. Ed. 1982), 1982 WL 31389, at *5.

As suggested by the passage quoted above, a heightened transferability standard applies to cases involving claimants aged fifty-five or older:

> Transferability of skills for individuals of advanced age. If you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to sedentary or light work, we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to other skilled or semiskilled work (or you have recently completed education which provides for direct entry into skilled work) that you can do despite your impairment(s). We will decide [whether] you have transferable skills as follows. If you are of advanced age and you have a severe impairment(s) that limits to you no more than sedentary work, we will find that you have skills that are transferable to skilled or semiskilled sedentary work only if the sedentary work *is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry*. . . . If you are closely approaching retirement age (age 60-64) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work *is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, processes, work settings, or the industry*.

*Id.* § 404.1568(d)(4) (emphases added); *see also Martin v. Heckler*, 748 F.2d 1027, 1035 n.6 (5th Cir. 1984) ("In order to find transferability of skills to skilled sedentary work for individuals who are of advanced age (55 and over), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry.").

Moreover, transferability requires that an individual both (1) possess skills acquired through previous work and (2) qualify for a semi-skilled or skilled job, since

6

unskilled positions, by definition, do not allow for the application of special skills. *See* 20 C.F.R. § 404.1568(a); S.S.R. 82-41 (Cum. Ed. 1982), 1982 WL 31389, at *2 ("Skills are not gained by doing unskilled jobs, and a person has no special advantage if he or she is skilled or semiskilled but can qualify only for an unskilled job because his or her skills cannot be used to any significant degree in other jobs."). Social Security Administration rules provide that:

> [F]or individuals of advanced age who can no longer perform vocationally relevant past work and who . . . have only skills that are not readily transferable to a significant range of semi-skilled or skilled work that is within the individual[s'] functional capacity . . ., the limitations in vocational adaptability represented by functional restriction to light work warrant a finding of disabled.

20 C.F.R. pt. 220 app. 2, Rule 202.07(c).

### D. Tucker's Claim

#### 1. Available positions for which Tucker is eligible.

The VE testified that Tucker could perform the tasks of a cashier, customer service representative, information clerk, or receptionist, each of which he characterized as a semi-skilled position. In fact, however, two of the identified jobs – cashier and information clerk – are defined by the Dictionary of Occupational Title ("DOT") as unskilled. D.O.T. 211.462-010, 237.367-018. Although the Commissioner argues that the VE's testimony is better evidence than the DOT of the skill levels and job requirements of various positions, that contention is at odds with the Commissioner's own policy, which requires support for a VE opinion before an ALJ may rely upon it to disregard a conflicting DOT definition. *See* S.S.R. (Cum. Ed. 1982), 1982 WL 31389, at *2 ("When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying

on the VE . . . evidence to support a determination or decision about whether the claimant is disabled.").

In this case, the ALJ did not challenge the VE's characterization of the cashier and information clerk positions as semi-skilled. Moreover, the VE expressly stated that he did not believe his characterizations to be at odds with the DOT. (*See* Tr. at 64 (Admin. Rec. at 92).) Accordingly, and because the applicable regulations dictate that a claimant of advanced age without transferable skills must be found to be disabled, the Court can uphold the ALJ's decision only if it finds both (1) that Tucker is capable of performing at least one of the two semi-skilled or skilled jobs identified (customer service representative and receptionist) and (2) that that job provides her with a "significant range of semi-skilled or skilled work" in the economy. 20 C.F.R. pt. 220 app. 2, Rule 202.07(c).

According to the DOT, the customer service representative position requires frequent[1] stooping, kneeling, crouching, and reaching. D.O.T. 959.361-010. Tucker argues that the ALJ erred in adopting the VE's opinion that she could perform this job, because Tucker's RFC specifically precludes her from engaging frequently in these activities. The Commissioner again contends, citing *Fields*, 805 F.2d 1168, that the VE's testimony is better evidence than the DOT of the requirements of the position. As explained above, that argument fails under both the applicable regulations and the Commissioner's own policy.

It is, moreover, unsupportable as a matter of public policy. The definitions provided by the DOT, while necessarily somewhat generic, must be evenly applied across

---

[1] The DOT defines "frequent" as a requirement that is in effect for between one-third and two-thirds of the workday.

8

the board in order to avoid arbitrary and unjust outcomes. Like all dictionaries, the DOT represents an attempt to ensure that communicants within the system that it serves speak a common language and, therefore, can be sure of understanding each other's statements. Deviations from the shared definitions court inaccuracy and ambiguity. The *Fields* holding is not to the contrary, as, in that case, the Fifth Circuit reversed an ALJ decision that relied on the DOT alone, on the ground that the testimony of a VE was necessary to determine whether the DOT"s broad definitions should be *narrowed*:

> The Dictionary of Occupational Titles does not define the occupations of hand-lacer and pencil inspector as repetitive, low-stress jobs. Nor does the dictionary describe the particular skills or qualifications needed for the positions. It also fails to identify the unique requirements of the positions, such as the pace at which one must work or the environment in which the work is performed. Instead, it simply gives a general description of the duties involved. The fact that Fields may be able to inspect a pencil or lace a football does not necessarily mean she can function as a pencil inspector or hand-lacer. The ALJ's determination that Fields can perform those jobs is mere speculation.

*Id.* at 1170. Nothing in the *Fields* opinion supports the conclusion that the VE can *expand* a DOT definition to include an otherwise ineligible claimant.

The Court finds, therefore, that the customer service representative position is, to a significant degree, defined by the frequencies with which various actions are required. A job that entails different frequencies is not a customer service position; it is something else. To the extent, then, that the VE's testimony conflicted with the express provisions of the DOT, the DOT should have prevailed, and the ALJ committed error by instead relying upon the opinion expressed by the VE. A proper evaluation of the record evidence thus compels a finding that Tucker is incapable of performing the work entailed by the customer service representative position.

The receptionist position, however, involves no stooping, kneeling, or crouching. D.O.T. 237.367-038.  It is a "classically sedentary" job.  (Tr. at 65 (Admin. Rec. at 93).) Tucker nonetheless contends that she is incapable of performing the required tasks, which include frequent reaching and handling, because of the limited functioning of her left (non-dominant) arm and hand.  In support of this position, she points to the VE's testimony, at the hearing, that such reduced ability would limit the field of available jobs to between 10 and 15 percent of the total number of positions in each field and that a person who could rarely or never look up, down, or to the side or who needed to lie down and rest for two hours per day could not competitively perform the receptionist job.  (*See id.* at 96-97.)

The question whether Tucker is unable, as a matter of law, to fulfill the duties of a receptionist is a close one and, happily, one that the Court finds it unnecessary to resolve, as the disparity between the number of jobs that the ALJ considered available to Tucker and the number of positions for which she is even conceivably eligible is so great that the Court cannot find that the ALJ's decision is based upon substantial record evidence. According to the VE, there are approximately 12,000 receptionist positions available in the greater Houston area and about 800,000 such jobs nationwide.  Given Tucker's limitations, she is actually eligible for – at best – 1,800 and 120,000 jobs in each respective market.  In contrast, the ALJ based his decision on the assumption that Tucker could choose from among 105,000 local jobs and more than 7.2 million nationwide. (ALJ's Decision at 8 (Admin. Rec. at 23).)  Accordingly, the Court finds that findings number 10, 11, and 12, which state that Tucker has transferable skills, can perform a significant range of light work, and can perform a significant number of jobs in the

national economy, are not based upon substantial evidence and must therefore be vacated and remanded for further proceedings consistent with this Order.

### 2. Severity of Tucker's fibromyalgia and neuropathy.

Tucker next argues that the ALJ erred in failing to find that her fibromyalgia and neuropathy are severe. She points out that two treating physicians and a consulting doctor have diagnosed her with both diseases and that other examining physicians have characterized the conditions as severe. The Commissioner argues that the ALJ was justified in rendering a decision contrary to the opinions of Tucker's physicians, because Tucker's testimony regarding her daily activities was inconsistent with her claim of total disability and undermined her credibility, and because her allegations of severity were unsupported by objective medical evidence.

The Commissioner is correct in stating that "subjective complaints must be corroborated at least in part by objective medical testimony." *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989). And the Fifth Circuit has held that an ALJ may decrease the ordinarily great weight afforded to the opinions of treating physicians, if good cause exists for doing so. *Leggett v. Chater*, 67 F.3d 558, 565-66 (5th Cir. 1995). According to the *Leggett* court, good cause justifies "disregarding statements [by the treating physician] that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence." *Id.* at 566 (insertion in original; internal quotation marks omitted).

In this case, Tucker has offered the testimony of at least two treating physicians, whose diagnoses are accompanied, in the record, by voluminous documentation from Tucker's medical charts. (*See* Admin. Rec. at 273, 282, 291, 293.) The Commissioner

11

does not seriously challenge the objectivity of this evidence or the fact that it was obtained through legitimate medical techniques. And the *Leggett* opinion makes no mention of the ALJ's evaluation of a claimant's own credibility as a factor justifying the abandonment of the treating-physician rule. Accordingly, the Court finds that the ALJ's failure to apply the treating-physician rule was error.

The ALJ also erred in ruling that the impairments were not severe. "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (final insertion added; internal quotation marks omitted). An ALJ is required to consider the cumulative severity of all impairments together. 20 C.F.R. § 404.1520(a)(4)(ii); *id.* § 404.1523; *Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000). Here, the ALJ failed to do so. Accordingly, finding number 3 is vacated to the extent that it does not find Tucker's fibromyalgia and neuropathy to be severe and is remanded for resolution of the issue by application of the proper standard.

### 3. Tucker's credibility.

Tucker next challenges finding number 5, which states that Tucker's testimony concerning her limitations was not completely credible.

> In determining the credibility of [a claimant's] statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to

12

> work may not be disregarded solely because they are not substantiated by objective medical evidence.

S.S.R. 96-7p (Cum. Ed. 1982), 1982 WL 31389, at *1.

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight [that] the adjudicator gave to the individual's statements and the reasons for that weight.

*Id.* at *2.

In this case, the ALJ explained that Tucker's own testimony concerning her daily activities undermined her assertion of complete disability. He further observed that some medical evidence supported the conclusion that Tucker was capable of performing more tasks than she claimed. While this Court might, on the same facts, have reached the opposite conclusion – the reasoning that Tucker would understate her abilities in one breath and concede them in the next appears particularly tenuous – it is not empowered to review that conclusion *de novo*, and it cannot find that the ALJ's decision on this point was unsupported by substantial evidence. The ALJ was in the best position to observe Tucker's demeanor and behavior during the hearing, and the Court therefore declines to vacate, on the basis of a cold record, his finding concerning credibility. Accordingly, Tucker's motion is denied as to finding number 5.

### 4. Tucker's RFC

Tucker also claims that the ALJ failed to follow the Commissioner's rules governing the determination of her RFC and that the limitations that he found are unsupported by substantial evidence. Specifically, Tucker argues that the ALJ impermissibly disregarded the medical opinion of Dr. Karimjee, her treating physician. The Commissioner responds by pointing out that an ALJ is not required to adopt the non-

medical (*i.e.*, legal) opinion of a treating physician or specifically to refer to each document authored by such a physician. *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

A medical opinion by Dr. Karimjee, accompanied by documents from Tucker's medical records, appears at pages 349-51 of the administrative record.[2] That document contains no legal conclusions; rather, it sets forth Dr. Karimjee's medical opinion, formed during the course of Tucker's treatment, concerning her abilities to perform certain tasks. The report is not inconsistent with the other substantial evidence in the record and should, therefore, have been accorded controlling weight. *See* S.S.R. 96-2p (Cum. Ed. 1982), 1982 WL 31389, at *1. Accordingly, the Court vacates and remands finding number 6 for consideration in light of Dr. Karimjee's opinion.

### 5. The ALJ's finding of no disability.

Because the ALJ's ultimate conclusion that Tucker is not disabled is unsupported by substantial record evidence, finding number 13 must be vacated. The Court declines, however, to award Tucker the requested disability benefits at this stage. The relevant evidence should, in the first instance, be reviewed by the ALJ, pursuant to the legal standards elucidated in this Memorandum and Order. Accordingly, the case is remanded for reconsideration.

### 6. The request for reassignment.

Tucker asks that her claim be assigned to a different ALJ on remand, on the ground that ALJ Abrams is prejudiced against disability claimants. Tucker's counsel has represented to the Court that an official complaint has been lodged against Abrams with

---

[2] It appears that this opinion may inadvertently have been omitted from the record originally considered by the ALJ.

14

the Regional Chief Administrative Law Judge. The determination whether Abrams has engaged in misconduct or violated his duty of impartiality is for that Judge to make, and the Court therefore denies Tucker's request for reassignment. Tucker is, of course, free to return to this Court, if necessary, to offer evidence of any future misfeasance by Abrams upon remand.

### III.    CONCLUSION

The Commissioner's motion for summary judgment is **DENIED**, and Tucker's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Findings number 3, 6, 10, 11, 12, and 13 of the ALJ's decision (regarding the types and numbers of available jobs that Tucker is capable of performing; the severity of her fibromyalgia and neuropathy; her RFC; and whether she is disabled) are hereby **VACATED** and **REMANDED** for further proceedings not inconsistent with this Memorandum and Order.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 27th day of July, 2006.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**